UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------

EDWARD O'FARRELL,

                      Plaintiff,

      -against-

MONEY MEDIA, INC.; and
THE MONEY MEDIA, INC.  BUSINESS
BUILDERS INCENTIVE PLAN,

                      Defendants.

06 CIV. 13460 (DC)
(ECF CASE)

COMPLAINT

---------------------------------------------------------------

      Plaintiff Edward O'Farrell, by his attorneys Beranbaum Menken Ben-Asher & Bierman LLP, alleges as follows:

      1.   This is an action arising under the Employee Retirement Income Security Act of 1974 (ERISA), Sections 510 (29 U.S.C. Sec. 1140) and Sec. 502(a)(1)(B) (29 U.S.C. Sec. 1132(a)(1)(B)).

      2.  Plaintiff alleges that defendant Money Media, Inc. terminated his employment in violation of Sec. 510 of ERISA, in that defendant terminated him for the purpose of interfering with his attainment of rights under its Business Builder Incentive Plan (BBIP) in which he was a participant.

      3.   Plaintiff also alleges, pursuant to Sec. 502(a)(1)(b) of ERISA, that defendant Money Media Inc. Business Builders Incentive Plan wrongfully denied him benefits to which he was entitled as a participant in the Plan, in that the defendant BBIP unlawfully redeemed plaintiff's unvested units after his termination.

      4. Plaintiff seeks declaratory and injunctive relief, including reinstatement to his position and all lost benefits of his employment,  an order requiring defendants to

reinstate plaintiff to full participation in the BBIP, with benefits commensurate with the benefits plaintiff would have received had he not been terminated, the benefits unlawfully denied plaintiff by the Plan, and an order clarifying and enforcing plaintiff's rights under the terms of the Money Media, Inc. Business Builders Incentive Plan.

## JURISDICTION

5.  This action arises under Sections 510 and 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Secs. 1132(a)(1)(B) and 1140.

6.  This Court therefore has jurisdiction over this action pursuant to ERISA Sections 502(e)(1) (29 U.S.C. Sec. 1132(e)(1)) and 502(f) (29 U.S.C. Sec. 1132(f)), and 28 U.S.C. Sec. 1331.

## PARTIES AND VENUE

7.  Plaintiff Edward O'Farrell is a resident of the State of New Jersey.  He is a participant in defendant Money Media Inc.'s "Money Media, Inc. Business Builder Incentive Plan."

8.  Defendant Money Media, Inc. is a resident of the New York, N.Y. and is incorporated in the State of New York.  It has its headquarters at 1430 Broadway, New York, N.Y. 10018.  It is an employer engaged in an industry or activity affecting commerce, within the meaning of 29 U.S.C. Sec. 1002(5) and 1002(12).

9.  Defendant Money Media, Inc. Business Builder Incentive Plan ("BBIP") is administered in New York, N.Y., and is a resident of the State of New York, having offices at 1430 Broadway, New York, N.Y. 10018.  The BBIP is governed by a written

Plan.  Under the terms of the Plan, the BBIP is administered by the Board of Directors of defendant Money Media, Inc., which is the Plan administrator for the BBIP.  The sole member of the Board of Directors of Money Media, Inc. is defendant Money Media's Chief Executive Officer, Michael Griffin. The BBIP is an employee benefit plan within the meaning of  ERISA Sec. 3(3) and ERISA Sec. 510.

10.  At all relevant times, plaintiff was a participant in the Money Media, Inc. Business Builder Incentive Plan, within the meaning of ERISA Sec. 3(7).

11.  Venue is therefore proper in this district pursuant to Sec. 502(e)(2) of ERISA (29 U.S.C. Sec. 1132(e)(2)), in that the Plan was administered in this District, defendants reside in this District, and defendants may be found in this District.

FACTUAL ALLEGATIONS

12.  Plaintiff  was employed by defendant Money Media, Inc. (formerly known as Tower Media) for almost six years, from January, 1999 through November 29, 2004.

13.  Plaintiff Money Media, Inc. is owned and controlled by Michael D. Griffin, its founder, President, Chief Executive Officer, and sole officer and Board member.   Money Media, Inc. has approximately sixty employees.

14.  As described on Money Media Inc.'s website, Money Media is "the premier source of intelligence for investment management and corporate governance officials....[and]   support[s] the business IQ of thousands of corporations and organizations across the globe."   The company provides information to clients on institutional and high net worth asset management, mutual funds and their governance, corporate governance, and executive compensation.    Money Media also sponsors an Outstanding Directors institute, to educate members of corporate boards.

15. Michael Griffin and O'Farrell's business relationship dates back to 1993. In December, 1993, Griffin hired O'Farrell to work at another company Griffin controlled, Fund World. O'Farrell worked at Fund World from December, 1993 through November, 1995, until Fund World was sold.

16. Griffin formed Tower Media in August, 1995, and hired O'Farrell as a consultant, and then as a full time employee, in January, 1999.

17. O'Farrell began his work as a sales person and was promoted to Associate Publisher.

18. The initial terms of O'Farrell's employment were memorialized in a memo which was drafted by both O'Farrell and Griffin, although written as if addressed to Griffin from O'Farrell. The memo notes that O'Farrell would be paid a base salary of $60,000 plus commissions, and that he would be awarded 1,000 Business Builder Units (BBUs) under the Tower Media Business Builder Incentive Plan on July 1, 1999.

**O'Farrell's performance**

19. During his employment, O'Farrell was an exemplary employee, as evidenced by his reviews, substantial salary increases and bonus awards. Griffin's own statements about O'Farrell were laudatory.

20. A February, 1999 memo from Griffin stated that Tower's goal for plaintiff was "to use [his] strong ability to relate to people and to present our programs in a crisp and organized fashion so as to increase revenue stream."

21. When Griffin gave O'Farrell an advance for his first commission, in February, 1999, he wrote that he was "proud of your energy, organization and ability to connect."

22. In December, 1999, Griffin circulated a memo describing O'Farrell as "the

Most Persuasive Sales Person in [the] Fund Industry."

23. In June, 2000, Griffin, raised O'Farrell's annual compensation to $120,000, and noted that on a long term level, his performance was outstanding.

24. In January, 2001, Griffin wrote to O'Farrell that "I appreciate immensely your contribution to the growth of Tower Media," and that he wanted to provide O'Farrell with an equitable compensation package.

25. In January, 2003, Griffin wrote O'Farrell that he had "led us to a very good sales year, our best ever," and that he appreciated the integrity he brought to setting realistic goals, rather than "low ball" goals to increase his bonus. He lauded his "continuing efforts to build the business of Money Media." The next month he wrote "I appreciate all you have done to create value for the Business Builder Units."

26. O'Farrell's work on one of the early company's ventures, Ignites.com, was "extremely successful," Griffin wrote in February, 2003. He had a major role in obtaining a profit of $786,000 on revenue of $1.6 million – as Griffin noted, a 50 per cent profit margin. By mid-2004, Griffin acknowledged that Ignites.com was "carrying the entire business," in that the company's other products were not profitable.

27. In December, 2003, Griffin gave O'Farrell the company's first "Tiffany Award" for outstanding contributions to Money Media.

28. In July, 2004, Griffin payed O'Farrell the balance of the full $44,000 bonus to which he had aspired for the first six months of the year "to demonstrate my confidence in you at a time when [one of O'Farrell's subordinates] was being critical of you."

29. Griffin steadily raised O'Farrell's compensation to reward him for his achievements and give him incentives to continue with the company. By 2001, O'Farrell's compensation had increased to more than $150,000 per year. In February,

2003, Griffin wrote O'Farrell that "we want a compensation package of between $175,000 and $200,000 if all the goals are met for a year." Griffin maintained O'Farrell's base at $132,000 and increased his incentive compensation to $55,500.

30. In February, 2004, Griffin raised O'Farrell's base to $150,000 and provided for a discretionary bonus of up to $88,000.

**The Business Builder Incentive Plan**

31. Throughout O'Farrell's employment, Griffin repeatedly awarded O'Farrell units in the Business Builder Incentive Plan, which had the potential for tremendous value if the company performed well and was eventually sold. Between 1999 and 2004, Griffin awarded O'Farrell numerous sets of Business Builder Units (BBU's), every year, or on several occasions during a year.

32. By 2004, O'Farrell had a total of 25,250 plan shares vested and 24,750 unvested.

33. The Business Builder Incentive Plan was amended in January, 1999, 2000, 2002 and 2004.

34. The 2000 revision, and the revised 2004 Plan, provided in Article VI that participants would vest in 25% of the shares on the four yearly anniversary dates of an award, and all unvested shares would vest upon the sale of the company.

35. The 2004 Plan, revised through September 27, 2004 and effective as of that date, provides that awards are granted to Participants in the form of 1997 Business Builder Units and 2004 Business Builder Units ("BBUs"). Although the Plan states that it is "unfunded," it also states that BBUs "shall be credited to accounts to be maintained for Participants."

36. Under the Plan, "Each 1997 and 2004 Unit is intended to represent the economic equivalent of one share of Common Stock."

37. The Plan also provides that "Each set of Units will share in any change in book value," and "Each set of Units will also share in the proceeds of an Asset Sale."

38. The Plan "is designed to operate over the entire period of the Company's existence."

39. The Plan is designed to, and was administered in order to, defer income to or beyond the termination of participants' employment, and in a manner which made it unlikely that participants would seek to obtain its benefits until that time.

40. Defendants encouraged Plan participants to defer benefits from the plan until or after the termination of employment, and discouraged participants from taking earlier distributions of shares.

41. Participants' shares in the plan had de minimis value before and unless the company were sold. The BBUs were far greater in value to participants if Money Media were sold, and on that basis were the most significant part of O'Farrell's compensation. Griffin was aware of this, and acknowledged this in various memos noting that O'Farrell was willing to forgo cash compensation for higher awards of BBUs.

42. Defendant BBIP, in its administration of the Plan, and defendant Money Media, Inc., regularly told Plan participants that any substantial increase in the value of their shares depended entirely on the valuation upon a sale at some point in the distant future. They emphasized that if a sale occurred, it would not be for many years.

43. Defendants wrote O'Farrell that since most of the company's earnings would be reinvested in new projects, the growth, if any, in the value of Units under the Plan would be modest.

44. Defendants gave O'Farrell a spreadsheet showing the valuation of his shares as of June 30, 2004.  The shares were valued at approximately negative six cents a unit. Defendants also gave O'Farrell another memo, showing the value of what appear to be 2004 shares as of July 1, 2004, at negative 6.06 cents per unit.

45. Defendants distributed a memo valuing the BBUs based on various hypothetical sale prices.  The memo stated that if Tower Media is eventually sold for $1,000,000, the value of each BBU would be 91 cents, and showed increased values based on a "eventual sale" at $100 million, of $90.90 per unit.  The memo noted that "This calculation assumes a total of 100,000 Business Builder Units and 1,000,000 shares of common stock are outstanding at the time of the sale."

46. When Griffin memorialized O'Farrell's 2002 base as $132,000, he noted that O'Farrell was "shooting for a value of the business at sale to be $10 million or more. That would bring your interest in the company closer to the $500,000 target that you have personally set.  I support your setting that goal and will work hard to help you achieve it."

47. However, Griffin "emphasize[d] that the value of the business today, given our lack of profitability in 2001 and the condition of our Wall Street market, is dramatically less than that."

48. In February, 2003, writing of the additional units he had awarded O'Farrell the previous month, Griffin emailed O'Farrell that "I appreciate how important these are to you."

49. Griffin regularly exhorted employees to build the value of the business in hope of eventual sale, and this was a primary objective of the company.

50. In September, 2004, Griffin circulated a memo noting the company's declining profits, increasing revenue, and "heavy investment spending," thus

communicating that the value of the company and the BBUs was still low, and that a sale of the company was a distant and speculative possibility.

51.   On November 17 and 22, 2004, Griffin gave O'Farrell an entirely positive performance review, and awarded O'Farrell another 10,000 BBUs.  In the award letter, Griffin's wrote "Congratulations and best wishes for the future.  I appreciate all you have done!"  With this award, O'Farrell had 24,750 unvested BBUs and 25,250 units vested.

52.   Griffin also told O'Farrell that he would be awarded another 6,500 units in January, 2005.

**O'Farrell's termination and contacts with Money Media**

53.   Approximately a week later, on November 29, 2004, Griffin abruptly fired O'Farrell, despite O'Farrell's almost six years of excellent performance.  Griffin told O'Farrell that he was being fired because he was being "negative" and "we are looking for different things," and that Griffin needed someone "more analytical."

54.   In email exchanges after the termination, Griffin acknowledged that O'Farrell had not be terminated for "cause" within the meaning of the BBU plan.

55.   The rationale proffered by Griffin for O'Farrell's termination was baseless, and was a pretext for terminating plaintiff in order to deprive him of benefits under the BBIP.

56.   Upon information and belief, at the time of his termination, O'Farrell held the largest stake in the BBIP.  He held forty per cent of the 1997 shares, and twenty-five per cent of the 1997 and 2004 shares combined.

57.    In a December 27, 2004 email, responding to O'Farrell's requests for information concerning his participation in the BBIP, what he could expect to receive

from the Plan if Money Media were sold, and his severance benefits, Griffin wrote O'Farrell that "After the end of the year, Mark Beller of Manger & Co. will establish a value for the Business Builder Units that have been assigned to you.  The vested units will continue in the plan.  The unvested units will be redeemed and the amounts that Manger & Co. calculate as due you will be paid out."

58. In a December 31, 2004 email to Griffin, O'Farrell asked Griffin to clarify how his termination was characterized by the BBIP and how his severance was calculated.

59. In a January 10, 2005 letter to O'Farrell, Griffin acknowledged that O'Farrell had not been terminated for "cause" within the meaning of the BBIP.  He wrote that "the definition in the Severance Policy is not as clear, but in my judgment covers a situation like yours."  Griffin wrote, "So I have concluded that you are eligible for severance pay, at the same time as you continue to have an interest in your vested units in the Business Builders Plan."  Griffin stated that "I know the Business Builder Units have been very important to you over the years.  So I want to assure you that I will continue to work very hard to create important value in them for both you and me."  Griffin also stated that Money Media had erred in its calculation of O'Farrell's severance benefits, and had overpaid those benefits by approximately $5,100.

60. On May 16, 2005, Griffin, as the plan administrator for the BBIP, wrote O'Farrell that upon his "resignation," his 24,750 unvested units had been "redeemed," and in payment for those units, he included a check for $9,530.02.   Griffin wrote that "At the time of your resignation, 25,250 units were determined to be vested.  These units will continue to be held for your benefit."

61. By redeeming O'Farrell's 24,750 shares, defendant BBIP deprived plaintiff of

-10-

valuable benefits under the Plan, in that the value of the shares is and potentially would be substantially higher than the amount for which defendant redeemed them.

62. Defendant BBIP's decision to redeem O'Farrell's shares was made in bad faith. Plaintiff had not resigned his employment, and there was no basis for the forced redemption of his unvested shares. In addition, Griffin, Money Media, and the BBIP Plan – which was entirely controlled by Griffin as Plan Administrator and the sole member of the Board of Directors – stood to financially gain from redeeming O'Farrell's shares. Under the Plan, redeemed shares reverted to the Plan, and the number of shares in the Plan was then reduced by the number of shares redeemed.

63. Upon information and belief, Griffin had a large block of shares under the Plans, and it was to his financial benefit to redeem plaintiff's shares.

64. In July, 2005, O'Farrell wrote Griffin seeking to appeal the determination redeeming his unvested shares. In that correspondence, he requested a copy of the Plan's claim procedure.

65. Griffin responded that the Plan had no claims procedure.

66. In August, 2005, O'Farrell emailed Griffin asking whether the BBU Plan was a ESOP, a Top Hat plan, or another type of plan under ERISA. Griffin replied that it was none of these, but rather an unfunded bonus plan not subject to ERISA.

67. In August, September, and October, 2005, O'Farrell requested that Griffin correct his assertion that O'Farrell had resigned, to reflect the fact that he had been terminated without cause. O'Farrell also sought to ascertain the correctness of the valuation of the unvested shares that had been involuntarily redeemed. Griffin did not respond to these communications.

68. Plaintiff has exhausted all available administrative remedies under the BBIP.

CLAIMS FOR RELIEF

FIRST CAUSE OF ACTION
Violation of ERISA Sec. 510
(against defendant Money Media, Inc.)

69. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 68 above.

70. Plaintiff was qualified for his position at Money Media and performed at an exemplary level.

71. Defendant Money Media terminated plaintiff from employment for the purpose of preventing plaintiff from attaining rights under the BBIP, including the award of 6,500 units he would have otherwise received in January, 2005, the award and vesting of other units under the plan, and in order to justify the involuntary redemption of 24,750 unvested units at a greatly reduced value, which O'Farrell otherwise would have retained.

SECOND CAUSE OF ACTION
Violation of ERISA Sec. 502(a)(1)(B)
(against defendant Money Media, Inc. Business Builder Incentive Plan)

72. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 68 above.

73. Defendant Money Media, Inc. Business Builder Incentive Plan (BBIP) unlawfully denied plaintiff benefits to which he was entitled under the Plan, including but not limited to unlawfully redeeming his 24,750 unvested units at a greatly reduced value.

WHEREFORE, Plaintiff requests that this Court enter an order:

1. Declaring that in terminating plaintiff from employment, defendant Money Media, Inc. violated ERISA Sec. 510;

    2.   Pursuant to plaintiff's claim under Sec. 510, reinstating plaintiff to his position, and awarding him all lost benefits of employment;

    3.   Clarifying plaintiff's rights under the terms of the Money Media, Inc. Business Builders Incentive Plan, pursuant to ERISA Sec. 502(a)(1)(B);

    4.   Enforcing plaintiff's rights under the terms of the Money Media, Inc. Business Builders Incentive Plan, pursuant to Sec. 502(a)(1)(B);

    5.   Directing defendant Money Media, Inc. Business Builders Incentive Plan to reinstate plaintiff's to full participation in the Plan, directing the Plan to award plaintiff 6,500 Plan units and all other units he would have received had he not been terminated, and reverse the redemption of the 24,750 shares defendants unlawfully redeemed in November, 2004;

    6.  Granting such other and further relief as permitted by law.

Dated:  New York, N.Y.
         November 22, 2006

                        BERANBUAM MENKEN BEN-ASHER & BIERMAN LLP
                        Attorney for Plaintiff Edward O'Farrell

                        By:   /s/_____
                           JONATHAN BEN-ASHER  (JB-A  4572)

                        80 Pine Street - 32nd floor
                        New York, N.Y. 10005
                        Telephone: (212) 509-1616
                        Facsimile:  (212) 509-8088
                        E-mail:  jb-a@bmbblaw.com